UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| UNITED STATES OF AMERICA | ) |  |
|---|---|---|
|  | ) |  |
| v. | ) | No. 2:17-CR-100 |
|  | ) |  |
| SCOTT ALAN EDMISTEN, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

**REPORT AND RECOMMENDATION**

Defendant has filed a Motion to Suppress and accompanying memorandum [Doc. 30]. The government has filed a Response [Doc. 33]. This matter is before the Court pursuant to 28 U.S.C. § 636 and the standing orders of the District Court for a Report and Recommendation. On August 9, 2018, the Court conducted an evidentiary hearing on Defendant's motion. Present at the hearing were Edmisten, Edmisten's counsel, David Leonard, Esq., and Assistant United States Attorney Gregory Bowman, Esq. Testifying at the hearing were Washington County Sheriff's Deputy Matthew Casura ("Deputy Casura") and WCSO Lieutenant William Doug Gregg ("Lt. Gregg"). The matter is now ripe for resolution. For the reasons stated herein, the undersigned RECOMMENDS the Motion to Suppress [Doc. 30] be DENIED.

**I.    PROCEDURAL BACKGROUND**

On October 11, 2017, a federal grand jury returned an indictment against Scott Alan Edmisten ("Edmisten") charging him with three counts of knowingly possessing firearms which were not registered to him in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. § 5861; one count of knowingly making firearms in violation of 26 U.S.C. § 5861(f); and one count of knowingly possessing firearms not identified by a serial number in violation of 26 U.S.C. §§ 5842, 5861(i), 5871 [Doc. 1]. On June 26, 2018, Edmisten filed a motion to suppress

1

[Doc. 30], challenging the traffic stop, the inventory search of his vehicle, his statement to law enforcement, the authority of his mother, with whom he was staying, to consent to a search of the place he was staying in her home, and the validity of three search warrants obtained to search his truck, his cellphone and his residence.

## II. FINDINGS OF FACT

On October 2, 2017, at approximately 3:51 a.m., Deputy Casura clocked on his radar a pick-up truck travelling 25 miles per hour over the speed limit, heading towards downtown Jonesborough, Tennessee. Deputy Casura activated his blue lights and attempted to catch up to Defendant's vehicle. He paced the truck at 83 m.p.h. for about a quarter of a mile before the driver pulled over and stopped in a church parking lot. The driver parked his truck across several parking spaces in the church parking lot.

Deputy Casura radioed the license plate to dispatch and then approached the vehicle. Upon approach, Edmisten, through a small crack in the window, told the deputy he had no reason to stop him. Deputy Casura responded by telling him that he had been "doing 55 in a 30 mph zone." Edmisten shrugged his shoulders. Deputy Casura then obtained Edmisten's driver's license and had dispatch run it. It came back suspended for failure to pay fines and costs. In addition, dispatch advised that Edmisten had a number of failures to appear in court. He returned to Edmisten's truck and asked him to step out. Rather than immediately complying, Edmisten remained in the driver's seat, gritting his teeth, for what the deputy estimated to be about 45 seconds, alternating between staring down at the center console and staring straight ahead. He then complied and exited the vehicle. Deputy Casura advised Edmisten why he was placing him under arrest, handcuffed him, and placed him in the back of his patrol car. Members of the Johnson City Police Department ("JCPD") arrived as backup.

The deputy elected to impound the vehicle rather than leaving it parked across a number of parking spaces in the church parking lot. As a consequence, he returned to the vehicle to perform an inventory search. This was consistent with the General Orders established by the Washington County Sheriff. General Order 61.1.4(B)(3) provides that "Unless the driver is incarcerated, the vehicle need not be towed if it is legally parked or on private property." (Exhibit 4, pg. 5). General Order 1.2 provides that "If an officer tows a vehicle he shall make an inventory search of the vehicle in order to protect the owner's property, the agency's and officer's liability, and to protect the officer…." (Exhibit 4).

During the inventory search, Deputy Casura discovered a handgun in the driver's door, as well as a handgun in between the center seat and console, where Edmisten had been staring moments before. He also found two "AR" style rifles in the passenger side of the truck, neither of which bore a serial number. All of the weapons had loaded magazines, but none in the chamber. Deputy Casura took Edmisten to the Washington County Detention Center (WCDC) and booked him in on the failures to appear and driving on a suspended license.

After booking Edmisten in at the WCDC, Deputy Casura advised him of his *Miranda* rights. Edmisten acknowledged he understood his rights and agreed to talk to the deputy. The deputy did not have Edmisten sign a written waiver. The deputy asked Edmisten if the weapons were fully automatic to which Edmisten said they were, but he was uncertain if they fired or not. Edmisten stated he personally made them into fully automatic firearms. Edmisten also acknowledged the weapons did not have serial numbers, but denied knowing this was illegal. He then told Deputy Casura that he knew why he had been arrested. It was "because of Child Protective Services." He told the deputy that Child Protective Services ("CPS") had taken his kids and that "justice would be served on those people" and that the officer could add his name to the

3

Case 2:17-cr-00100-RLJ-MCLC Document 45 Filed 08/21/18 Page 3 of 16
PageID #: 148

list. The deputy asked what he meant by that. Edmisten refused to go into any further detail. Edmisten said all he needed was "one gun and one bullet to blow his brains out after justice was served." Edmisten then started pounding the mattress and stopped talking.

At 7:15 a.m., Lt. Gregg arrived to examine the rifles found in Edmisten's truck. Lt. Gregg was previously aware of Edmisten due to some letters Edmisten had written to various judicial officers in the area. Lt. Gregg determined the rifles were fully automatic because the firearms had "milling marks," an indicator that the weapons were assembled using a kit and later drilled to allow for the discharge of ammunition without the hammer locking back into place. Lt. Gregg also noted the weapons had no serial number. At approximately 10:00 a.m., Lt. Gregg approached Edmisten with a written *Miranda* rights waiver, which Edmisten refused to sign and refused to speak to him.

On October 2, 2017, at 1:55 p.m. Investigator C.A. Arnette presented an affidavit and application for a search warrant for Edmisten's vehicle, (Exhibit 1), and cell phone (Exhibit 2) to the Honorable Lisa Rice, Criminal Court Judge for Washington County, Tennessee. She found probable cause to justify a search of both the truck and the cell phone and signed the warrants. (Exhibit 1 and 2).

On October 3, 2017, Lt. Gregg and ATF Special Agent Jamie Jenkins went to Edmisten's residence at 1915 Clearwood Dr. Johnson City, Tennessee. Ms. Linda Edmisten ("Ms. Edmisten") answered the door and identified herself as the Defendant's mother and the owner of the property. She told the officers that the Defendant has lived at her house since 2015, that he did not have a bedroom but stayed in the garage area downstairs, an area that she routinely accessed. Ms. Edmisten told officers that she entered the area nearly every day in order to clean and pick up dirty dishes and laundry. Ms. Edmisten let the officers into the garage area via a side door. No separate key was required for entry. As she was showing the officers around, she identified a locked closet

4

to the police, which she said she could not access because the Defendant had placed a personal padlock on it. Lt. Gregg also observed a locked cabinet. He noted some "micro-components," a soldering board, and items that could be used to make an Improvised Explosive Device (IED). In response to their discovery, they brought in a canine trained in the detection of explosives. The canine alerted on the pad locked cabinet and closet.

Lt. Gregg and Agent Jenkins stayed on the scene while a third search warrant was obtained by Investigator C.A. Arnette. On October 3, 2017, the investigator presented an application and affidavit in support of a search warrant for the residence of 1915 Clearwood Dr., Johnson City, Tennessee. Judge Lisa Rice approved the search warrant on October 3, 2017 at 3:05 p.m. When executing the search warrant, officers found another AR platform rifle containing an autosear that was fully automatic in addition to other firearms, specification sheets, ammunition and magazines.

## III.   ANALYSIS

### A.   Whether the initial traffic stop was supported by probable cause.

Edmisten first argues that the initial traffic stop of his truck was not supported by probable cause. It is well-established that where an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment." *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir.1996) (internal quotation marks and citation omitted). In this case, Deputy Casura witnessed Edmisten driving 55 mph in a 30–mph zone. Thus, the deputy had probable cause to believe that Edmisten was committing a traffic violation. See *United States v. Hill*, 195 F.3d 258, 265 (6th Cir.1999) ("[T]he Tennessee Code prohibits speeding, ... and Defendants do not dispute the fact that they were traveling in excess of the posted speed limit. Therefore, ... [the officer] had probable cause to make the initial traffic stop"). The Court finds the initial traffic stop was supported by probable cause

at the outset.

**B.     Whether the inventory search was conducted pursuant to standard criteria.**

Edmisten next challenges the inventory search of his vehicle. When Deputy Casura searched the vehicle after he arrested Edmisten, he did not have a warrant. As a general rule, warrantless searches are presumptively unreasonable, save for a few delineated exceptions. See *Arizona v. Gant*, 556 U.S. 332, 338 (2009). However, "inventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." *United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013)(quoting *Colorado v. Bertine*, 479 U.S. 367, 371, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987)); see also *United States v. Jackson*, 682 F.3d 448, 455 (6th Cir. 2012)("It is settled law that the police may conduct an inventory search of an automobile that is being impounded without running afoul of the Fourth Amendment"). "An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage." *Id.* (quoting *Whren v. United States*, 517 U.S. 806, 811 n.1 (1996)).

In this case, Deputy Casura elected to impound Edmisten's vehicle and have it towed. That decision was consistent with the General Orders established by the Washington County Sheriff that authorized impoundment and towing of a vehicle where the driver was taken into custody. General Order 61.1.4(B)(3) provides that "unless the driver is incarcerated" then the vehicle need not be towed. Here, Edmisten was arrested and incarcerated.

Once the deputy made the decision to have the truck impounded and towed, the General Orders not only authorize an inventory search, they mandate it. General Order 1.2 provides that if an officer has a vehicle towed, "he shall make an inventory search of the vehicle…." That is what occurred in this case. Once the officer properly elected to have the vehicle impounded and towed,

6

he had no discretion but to conduct an inventory search under the General Orders. It was during the execution of that search that the deputy discovered the firearms. There was nothing improper about this.

Edmisten argues that this inventory search was, in essence, a workaround to the requirement that a warrant be obtained to authorize the search. However, in this case, Deputy Casura acted in accordance with the General Orders governing such inventory searches and did not run afoul of the Fourth Amendment.

**C.     Whether Edmisten's was properly *Mirandized* and voluntarily waived his rights prior to giving his statement to Deputy Casura.**

Edmisten next claims his statement to Deputy Casura should be suppressed because he was not properly *Mirandized* prior to him being questioned while in custody and that he did not waive his rights. *Miranda* requires a suspect subject to custodial interrogation to be "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). There is no dispute that Edmisten was subject to custodial interrogation, and therefore the burden is on the government to prove compliance with *Miranda* and a valid waiver by Edmisten. See *United States v. Thomas*, 38 F. App'x 198, 202 (6th Cir. 2002). In this case, the Court finds the deputy advised Edmisten of his *Miranda* rights. The deputy testified that, while he recited the rights from memory, he covered all of the rights required to be provided to a suspect subject to custodial interrogation. Edmisten did not testify or otherwise challenge the deputy's testimony in this regard nor did he offer any evidence to contradict the deputy's testimony. The Court finds the deputy's testimony credible.

The next issue is whether Edmisten waived those rights. For a waiver to be valid, it must be made "voluntarily, knowingly, and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421, 106

7

S.Ct. 1135 (1986). "For a waiver to be knowing and intelligent, the suspect must be fully advised of his constitutional privileges. To be voluntary, a confession may not be 'the product of coercion, either physical or psychological.'" *Hill v. Anderson*, 881 F.3d 483, 502 (6th Cir. 2018) (citation omitted). That is, the suspect must understand that he has the right to remain silent, the right to an attorney, and that his statements could be used against him. See *Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851 (1987). "It is the government's burden to establish a waiver by a preponderance of the evidence." *United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009).

As an initial matter, Edmisten does not allege the deputy engaged in any coercive police activity or that his will was overborne such that he was coerced into making those statements to Deputy Casura. Next, the Sixth Circuit is quite clear that such a waiver of rights need not be made in writing or expressly made. *United States v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002). "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis v. Thompkins*, 560 U.S. 370, 384, 130 S. Ct. 2250, 2262 (2010). Indeed, the Court may infer a valid waiver from the actions of the person being interrogated. See *United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009) (denying defendant's motion to suppress where even though defendant did not sign written waiver, he stated he understood the rights and spoke with the officer). Here that is what happened. Edmisten expressed an understanding of his *Miranda* rights and voluntarily spoke with the deputy. The Court can infer a valid waiver from his actions. That he did not sign a written waiver is of no consequence under these facts. A written waiver is not the *sine qua non* for finding a valid waiver. *Id.* The Court finds he was properly *Mirandized* and validly waived his rights when he spoke with the deputy. His statement to the deputy was not obtained in violation of the Constitution.

**D.     The authority of Ms. Linda Edmisten to permit officers into part of the residence where Defendant resided.**

Edmisten next challenges the authority of the owner of the residence, who also happened to be his mother, to consent to officers searching the area of the house occupied by him, that is, in the garage area. "The Fourth Amendment permits a search without a warrant if valid consent to search is given." *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011). Such consent can be by third-parties under certain conditions. The Sixth Circuit has addressed this issue as follows:

> Consent may lawfully permit the police to enter even if it is not given by the occupant whose Fourth Amendment rights are at issue. A third party with a "sufficient relationship to the premises" may consent in the absence of the occupant in question. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (holding that a warrantless search of a bedroom with the consent of a person cohabiting with the defendant and claiming to be his wife did not violate defendant's Fourth Amendment rights). A third party's "common authority" "rests [ ] on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at 171 n. 7, 94 S.Ct. 988; cf. *Illinois v. Rodriguez*, 497 U.S. 177, 181–82, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (finding no common authority where a person sometimes spent the night at the apartment but never went there when the primary occupant was not at home). The police may also lawfully enter a home with the consent of a party who had only apparent authority to admit them, "if 'the facts available to the officer[s] at the moment [would] warrant a man of reasonable caution in the belief that [there was] consent [from a] party [that] had authority over the premises.'" *United States v. Kimber*, 395 Fed.Appx. 237, 243–44 (6th Cir.2010) (alteration in original) (quoting *Rodriguez*, 497 U.S. at 188, 110 S.Ct. 2793).

*Smith v. City of Wyoming*, 821 F.3d 697, 709 (6th Cir. 2016), as amended (May 18, 2016). Generally, "all family members have common authority over all the rooms in the family residence." *United States v. Clutter*, 914 F.2d 775, 777 (6th Cir. 1990). If a family member has "clearly manifested an expectation of exclusivity" there is not common authority over that space. *Id.* at 778.

9

The Court finds that Ms. Linda Edmisten was the owner of the residence and had the authority to consent to the search of the area where Edmisten was staying in the house. She advised officers that she had the authority over that particular area and even identified those portions of the house where she lacked such authority, that being the closet and cabinet. She advised officers she regularly cleaned up the area and picked up dirty dishes and laundry there. Thus, she had full access to the area where Edmisten stayed. This area where Edmisten stayed was connected to the main living area of the home, and a separate key was not needed to access it. She also advised officers that her son did not have a lease, nor did he pay rent. Edmisten had not taken any action to demonstrate an expectation of exclusivity in that area where his mother had taken the officers. He did, however, demonstrate that expectation in his closet and pad locked cabinet.

The Court finds that Ms. Linda Edmisten had the authority to permit officers in her residence and permit them into the area where her son was staying. It was in this area officers discovered the component parts for the potential creation of an IED and where the canine alerted for the presence of explosives in the closet and locked cabinet. The Court finds no issue with Ms. Edmisten's consent for officers to walk through her house.

**E.     The search warrants**

The Fourth Amendment requires that there be probable cause for a search warrant to issue. U.S. Const. amend. IV; *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008). "An issuing judge may find probable cause to issue a search warrant when there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Jenkins*, No. 17-1377, 2018 WL 3559209, at *4 (6th Cir. July 24, 2018)(quotations and citations omitted). The existence of probable cause must be gleaned from within the four corners of the affidavit submitted in support of the search warrant, with the Court considering the totality of the

10

Case 2:17-cr-00100-RLJ-MCLC   Document 45   Filed 08/21/18   Page 10 of 16
PageID #: 155

circumstances. See *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009

### 1. The Search Warrant for Edmisten's truck.

Law enforcement obtained a search warrant for Edmisten's 2014 GMC Sierra Truck from the Honorable Lisa Rice, Criminal Court Judge for the First Judicial District. (Exhibit 1). In support of the warrant, the investigator attached an affidavit which, in part, provided as follows:

> (8)
> On 8/21/2017, Officer Chad Proffitt completed a Memo report in reference to letters sent to Chancellor John Rambo, Judge James Nidiffer, Judge Roberty Lincoln, Judge Sharon Green of the Johnson City Juvenile Court. The packages [were] received between 8/14/17 and 8/16/17. The packages contained Biblical quotes from Exodus 22:22-24 (22"Do not take advantage of the widow or the fatherless. 23 If you do and they cry out to me, I will certainly hear their cry. 24 My anger will be aroused, and I will kill you with the sword; your wives will become widows and your children fatherless.) and Psalm 109. Also Article I of the Tennessee Constitution, a copy of Uncommon Sense, the Declaration of Independence and a copy of Sherman's March.
>
> (9)
> On 10/2/2017 Officer Matthew Casura attempted to stop a 2014, GMC, Sierra Truck, Grey, W5570R (TN) for speeding (55mph in 30mph zone) …. The officer initiated emergency lights to conduct a traffic stop.
>
> (10)
> The suspect refused to stop and increased his speed to 80 mph. The vehicle travelled approximately half a mile then stopped in the Midway Baptist Church parking lot.
>
> (11)
> The officer approached the vehicle which the Officer stated that the driver seemed unsteady and very angry. The Officer found that the suspect did have a suspended driver's license due to a Failure to Appear.
>
> (12)
> The suspect was taken into custody and an inventory was completed by the Officer. A firearm was discovered between the driver's seat and console. A Taurus .357 Magnum was found in the driver's door. A large amount of other long rifles (full automatic) and ammunition was found. Bladed weapons and extra magazines were also recovered.
>
> (13)
> The suspect had weapons with no serial number (.556 caliber and .308 caliber).

11

Case 2:17-cr-00100-RLJ-MCLC Document 45 Filed 08/21/18 Page 11 of 16
PageID #: 156

(14)
The suspect was questioned, under Miranda, and became very angry toward the Officer. The suspect stated that the traffic stop was over CPS and that "Justice is coming" and that the Officer could add himself to the list.

(15)
More firearm parts were inside the vehicle, along with a bag of dark clothing and hood.…

(16)
There may be other items along with the bolt and clothing to connect the suspect with the threats towards government officials plus parts to the weapons already seized.

(Exhibit 1).

Edmisten contends that the affidavit lacked probable cause because it was "clouded" by information about Edmisten's prior dealings with the court system and CPS, about the packages he sent to the local judicial officers of the First Judicial District. The Court does not find that the inclusion of such information about Edmisten's conduct undercuts the probable cause analysis. If anything, it heightens it. The affidavit recounted Edmisten's bizarre behavior of sending letters to the local judiciary, which while it may not have been a crime, it heightened law enforcement's concern for the judicial officers' safety. In addition, it recounted that Edmisten was carrying a whole cache of guns in his truck, some of which were illegal, some fully automatic and some whose serials numbers had been removed. That alone would support a probable cause finding that there may be other illegal items in the vehicle. The affidavit also recounted that Edmisten had told the deputy that he could add his name to "the list" of those to whom justice was coming. That cannot be read as anything but a threat. Combined with CPS removing Edmisten's children from his custody, the presence of a cache of illegal firearms in the truck found during the inventory search, the Court finds the affidavit adequately sets out probable cause to support the issuance of a search warrant for Edmisten's truck.

12

## 2. The Search Warrant for Edmisten's cell phone.

The second search warrant is for Edmisten's cell phone. Again, Edmisten challenges the probable cause finding made by Judge Rice. The affidavit stated that Deputy Casura stopped Edmisten for speeding and arrested him for failing to appear in court. The affidavit continued as follows:

> 17. On or about 8-8-2017 your affiant became aware of [Edmisten] when Judge James Nidiffer provided a packet of information mailed to him at the Justice Center from [Edmisten]. The packet contained a letter which referenced the bible, the Declaration of Independence, as well as information on Sherman's March (civil war history).
> …
> b. Additionally, Judge Lincoln, Nidiffer, and Arnold were discovered to have received packets of information from [Edmisten].
>
> c. Chancellor Rambo also received a packet from [Edmisten].
>
> 18. Your affiant believes that the information contained in the received packets are indicative of threats to those who received them. Your affiant also believes that due to [Edmisten's] bizarre history with members of Child Protective Services and their recent involvement in removal of his children that [Edmisten] may now be emotionally distraught and may have planned, or may have been planning a dangerous assault upon the government officials involved in this case.
>
> 19. Although no specific threats have been found, your affiant believes that the events that led up to Officer Casura's encounter, in addition to the cache of weapons found upon him and his threats to invoke justice, that [Edmisten] poses a risk to himself and others.
>
> 20. Your affiant knows through a discussion with Officer Casura that [Edmisten] may have used his phone to obtain information about building or otherwise converting a firearm into a fully automatic weapon. …
>
> 21. Your affiant also knows, due to the amount of firepower and ammunition at hand, that [Edmisten] was well equipped upon his arrest to commit a mass shooting incident.
>
> 22. Upon his arrest, he was found with an Apple iPhone … which was seized and [as] evidence in anticipation of an application for a search warrant.

13

Case 2:17-cr-00100-RLJ-MCLC   Document 45   Filed 08/21/18   Page 13 of 16
PageID #: 158

[Exhibit 2].

As noted before, in making a probable cause determination, the magistrate makes a "practical, common-sense decision ... given all the circumstances set forth in the affidavit." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "Probable cause 'is not a high bar.'" *District of Columbia v. Wesby*, ––– U.S. ––––, 138 S.Ct. 577, 586, 199 L.Ed.2d 453 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 134 S.Ct. 1090, 1103, 188 L.Ed.2d 46 (2014)); see also *United States v. Owens*, No. 17-1905, 2018 WL 3801701, at *2 (6th Cir. Aug. 9, 2018).

The Court finds that the search warrant for the cell phone is supported by probable cause. The affidavit goes into detail as to the obviously bizarre and quite frankly threatening packages sent to many of the state judicial officers. It explained that a traumatic event had recently occurred in Edmisten's life, that is, CPS's removal of his children. It explained why Edmisten could be motivated to cause harm to those judicial officers. It then detailed the fact that he was carrying around a cache of firearms in his vehicle, that he was "well equipped" to commit mass murder, and that he had threatened an officer as well.

Specifically to the cell phone, the affidavit noted that, based on a conversation with Deputy Casura, Edmisten may have used the cell phone to obtain information about converting firearms into a fully automatic weapons. After all, that is exactly what Edmisten had done to a number of the firearms found in his truck. All of this supports a common-sense finding that there is probable cause that the cell phone may contain evidence of criminal activity.

### 3. The Search Warrant for the residence at 1915 Clearwood Drive, Johnson City, Tennessee.

Edmisten also claims probable cause does not support the issuance of a search warrant for the residence at 1915 Clearwood Drive, Johnson City, Tennessee. On October 3, 2017, Judge Rice authorized the search of 1915 Clearwood Dr. Johnson City, Tennessee. Her decision was based

14

on the affidavit, which provided, in part, as follows:

> 22. As a result of [Edmisten's] arrest, two search warrants were applied for concerning [Edmisten's] cellphone and truck in which he was stopped in on the morning of 10-2-2017. The cell phone was found upon his possession at the time of his arrest and was secured as evidence. The truck was held at the impound lot. The warrants were authorized and a subsequent search was made:
>
>     a. A forensic analysis of [Edmisten's] Apple iPhone yielded internet search histories regarding drug use, contemplations of suicide, and information concerning the making of bombs. Various photographs of gun parts and diagrams were also found upon the phone.
>
>     b. A search of the truck revealed more ammunition and gun parts; namely ammunition that could be used to penetrate body armor as well as gun parts (AR rifle bolt assemblies).
>
> …
>
> 24. Mrs. Edmisten … informed Lieutenant Doug Gregg that her son had been living in the residence for approximately two years….
>
> 26. … Due to finding an additional gun bolt assembly (gun part) in [Edmisten's] vehicle during the before mentioned search warrant execution, in conjunction with his admission that he makes firearms and that he has converted them to being fully automatic, your affiant believes that [Edmisten] may have additional illegal firearms and manufacturing tools at his residence, which is at his mother's house at 1915 Clearwood Dr., Johnson City, Tennessee, Washington County.
>
> 27. During a walkthrough of the basement area of this residence, Lt. Gregg observed what he recognized as potential components used to construct an Improvised Explosive Device (IED). He observed items such as soldering station, electronic circuitry, wiring, galvanized pipe, and large style fireworks mortars, of which can be used to construct bombs.
>
> 28. A WCSO explosives recognition dog was called to the residence of which the K9 Nadee showed positive alert to the presence of explosives to both the before mentioned pad locked cabinet and closet.

[Exhibit 3].

    The affidavit noted that Edmisten had admitted to making fully automatic weapons, some of which were discovered in his vehicle; that officers discovered component parts to make IEDs in very residence they were seeking to search; and that canine trained in explosives recognition

15

alerted to the presence of explosives before the pad locked cabinet and the closet. His mother noted to the officers that Edmisten lived at the residence. Defendant had admitted that he manufactured fully automatic firearms. When officers discovered the materials at the residence to make IEDs and other firearms, it was only logical to think there could be other firearms or explosives in the home. The Court finds probable cause supports the conclusion that the residence could contain additional evidence of illegal manufacturing of fully automatic machine guns and explosive devices. The location of multiple illegally-manufactured firearms, coupled with Edmisten's own admissions, the presence of IED components, and the alert of the canine all support a finding of probable cause that evidence of contraband would be found in the two locked areas of the residence.

## IV.   CONCLUSION

The undersigned RECOMMENDS that Edmisten's Motion to Suppress [Doc. 30] be DENIED for the reasons outlined in this Report and Recommendation.[1]

    Respectfully submitted,

    s/Clifton L. Corker
    United States Magistrate Judge

---

[1] Any objections to this Report and Recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).